UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

UNITED STATES OF AMERICA,

        Plaintiff

vs.                                                                  Case No. 2:13-cr-40- JMS-CMM

DAVID NAYLOR,

        Defendant

**REPORT TO DISTRICT JUDGE
PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

        A hearing was convened in this matter on November 5, 2013, on a Petition for Warrant or Summons for Offender Under Supervision filed October 31, 2013.  [Doc. 6]  The Court granted the petition for a summons and set this matter for hearing on the defendant's alleged violations of the terms and conditions of his sentence while on supervised release.  This matter was referred to the Magistrate Judge for hearing pursuant to 18 U.S.C. 3401(i) in an Entry and Order issued by The Hon. Jane Magnus-Stinson, U. S. District Judge, on November 1, 2013.  [Doc. 9]

        The Government appeared by James M. Warden, Assistant United States Attorney; the defendant, David Naylor, appeared in person (in custody pursuant to an order of detention entered at the time of his initial appearance on November 1, 2013 [Doc. 14]) and by counsel, John A. Kesler.

        The Petition states two allegations regarding the defendant's noncompliance with conditions of supervised release:

1

      1.      The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.

      2.      The defendant shall not commit another federal, state or local crime.

The latter allegation was supplemented at the hearing by the Government to allege the defendant committed three criminal offenses under Indiana law: a violation of I.C. 35-45-2-1 (intimidation of a law enforcement officer or probation officer, a Class D felony); a violation of I.C. 35-44.1-3-1 (resisting law enforcement, a Class A misdemeanor); and a violation of I.C. 35-45-1-3 (disorderly conduct, a Class B misdemeanor).

Prior to the presentation of evidence, defendant moved to remove his handcuffs during the proceeding. The Government objected. The motion was denied. The defendant moved for a separation of witnesses. The Government did not object. The motion for separation of witnesses was granted.

The Government's case consisted of the testimony of four persons: Mary Ellen Gifford, Courtroom Security Officer; Ryan Filson, Supervising Deputy U. S. Marshal, Evansville; Gabriel Guerrero, Deputy U. S. Marshal, Evansville; and Ryan Sharp, U. S. Probation Officer. The defendant's case consisted of testimony of two persons: Abigail Naylor, the defendant's daughter (who testified over objection of the Government because she failed to exit the courtroom during the hearing and violated the separation order); and David Naylor, the defendant.

The parties stipulated that the standard of proof in a revocation of supervised release proceeding is preponderance of the evidence. Prior to the hearing, the parties stipulated that the Court could view outside the presence of the parties and their attorneys certain surveillance video recordings of the incident at issue, including video from an entry vestibule, the entrance to the

courtroom, and the northeast surveillance camera covering the canopy and front sidewalk of the United States Courthouse.  The Court advised the parties and counsel that these videos had been viewed privately and without input from any party or witness.  The video had been retrieved at the request of the Government by Supervising Deputy Marshal Filson and delivered to the Court, the Government and to counsel for the defendant in advance of the hearing.

The undersigned recommends to the Court adoption of the following Findings of Fact and Conclusions of Law:

### **Findings of Fact**

David Naylor currently is on supervised release following a conviction in the District of Nebraska for mailing threatening communications.  He was sentenced on September 23, 2013.  He resides in Perrysville, Vermillion County, Indiana, within the jurisdiction of this Court.  Prior to sentencing and after sentencing, Naylor maintained a residence in this District and both his pre-trial and supervised release were managed by this Court's Probation Office.  The case was assigned to Ryan Sharp.  The original sentence issued by the District of Nebraska (The Hon. John M. Gerrard, U.S. District Judge) was for time served, supervised release for three years, and restitution of $1,847.87.  In addition, Naylor was ordered to complete 100 hours of community service as a term of his supervised release.

During pre-trial supervision, Naylor was not cooperative with Sharp's efforts to visit at the Perrysville residence.  Naylor acted in a defensive manner in an initial encounter with Sharp and his supervisor, Holly Barrineau.  A home visit is standard practice for pre-trial release and supervision.  That practice typically includes a home inspection (as contrasted to a search) to ascertain the defendant's quarters and living circumstances.  He initially resisted but eventually

relented to grant them access to his house and to answer questions regarding his pre-trial supervision. His behavior was characterized as highly agitated and Supervisor Barrineau was sufficiently concerned that she prohibited Sharp from further contact with Naylor at his home. The initial visit was terminated prematurely as a result of Naylor's behavior. All future contacts were to be conducted at the United States Courthouse in Terre Haute where Sharp's office is located.

The first of those visits occurred February 19, 2013. Naylor entered the building through the front entrance where courtroom security personnel have in place detection equipment for personal property and persons. These officers screen all persons and their possessions upon entering the building to detect any hidden or dangerous weapons or other articles and to assure the security of courthouse personnel. As a part of that screening process, individuals are requested to produce photo identification, empty their pockets, remove objects with metal such as belts, and walk through a magnetometer. Personal property is inspected by x-ray detection equipment on a conveyor belt. Naylor's visit on this occasion resulted in a commotion during which he became angry at the perceived intrusion. Although he eventually gained entry, Sharp reports that Naylor was angry and resistant. He told Sharp that he had been "fucked over by the feds" and had "a right to be angry." Their meeting proceeded, however, and there were no further outbursts.

Again on May 20, 2013, Naylor encountered difficulty entering the courthouse. On this occasion he did not have any identification on his person. He complained about being "hassled," but Sharp testified that he was able to diffuse the situation and complete the visit. They spoke over the telephone on other occasions during supervised release.

Naylor was sentenced on September 23, 2013. His first supervised release meeting was scheduled for 1 p.m. on October 31, 2013. According to Naylor, he arrived early and waited in his car to "collect myself" before entering the building. Upon entry to the building, he encountered Gifford, who was on temporary assignment from Indianapolis and was on duty as the courtroom security officer. She asked for his identification. There is conflict in the testimony whether he threw the ID card into a personal property bowl (the video is inconclusive). He was told to remove his coat, belt, and any metal on his person. He protested forfeiting his belt claiming that his pants would fall. He eventually complied but grumbled and uttered profanity at the officer. At one point, he clearly attempts to circumvent entering the magnetometer by stepping across a barrier; he was ordered back across to the security area and complies. (He explains that he did this because he was told he would have to wait on benches outside the courtroom for Sharp to become available.) Gifford testified that he used phrases such as "fuck off" or "fuck off bitch" more than once during the exchange.

Because Gifford was concerned about Naylor's aggressive and resistant behavior, she reported the incident to two deputy U.S. Marshals who were coincidentally walking toward the security area from an adjacent hallway. She advised Filson, Guerrero, and CSO Charles Ellis about the incident. (Ellis had been present for at least one of the earlier "commotions" involving Naylor.) Promptly thereafter, Filson, Guerrero, Ellis and Sharp approached Naylor in the waiting area outside of the courtroom. This area is not fully visible on the surveillance video. Sharp had exited his office as the meeting with Gifford, Filson, Guerrero, and Ellis was in progress. Gifford elected to stay at her post and not approach Naylor to avoid further agitating the situation.

5

Each witness then described a three- to four-minute period in which clearly identified federal law enforcement officers approached Naylor to determine whether there was a problem and further determine whether Naylor constituted a threat to the security of personnel in the building. Naylor was immediately confrontational and non-cooperative. Sharp then indicated that their meeting would not proceed and that Naylor would have to return at a later date when he was calm and his personal conduct was more appropriate. Naylor, who had traveled nearly 60 miles for the meeting, was incensed at the prospect of incurring additional expense to return another day.

The officers had been made aware that Naylor's underlying conviction was for mailing threatening communications and that Naylor had previously resisted routine courthouse security procedures. Attempts to calm and redirect Naylor were unsuccessful—he then let loose with a stream of epithets that grew increasingly aggressive, according to testimony by Gifford (who could easily hear the exchange), Filson, Guerrero, and Sharp. Naylor shouted at the officers, "Fuck you . . . fuck you, mother fuckers," prompting Sharp to direct Naylor to leave the premises and reschedule their meeting. Naylor did not do so. Naylor declared that his attitude would not change and that he had been singled out for mistreatment—"You are fucking with me, trying to embarrass me." When Guerrero intervened, Naylor turned on him, "Who the fuck are you?" and accused Guerrero of assaulting him during an earlier incident.[1] Guerrero advised him they had never met and joined with the other officers in encouraging Naylor to leave peaceably and return on another day.

---

[1] The Court deduces that Naylor's original arrest perhaps involved the use of force and that the force may have resulted in injury to Naylor. The record is not clear where the alleged incident occurred or which officers, if any, were involved. Inasmuch as Guerrero has been assigned to this District approximately one month, it's very clear that he was not involved in any prior contact with Naylor.

At this point, all of the officers testified to Naylor growing calm in a peculiar and unsettling way—referred to as a "thousand-yard stare" in the Marshals Service training, according to Guerrero. Naylor appeared to be staring at his vehicle, and even he concedes that he indeed quieted suddenly and stared into the distance. In the judgment of Filson and Guerrero, the change in demeanor signaled potential problems. Then, just as suddenly, his behavior began to escalate again and he shouted in Guerrero's face. He then walked toward the exit door. Not knowing whether Naylor had a weapon in his vehicle, and having legitimate concerns about whether he might further retaliate as a result of the incident, the marshals followed him out the front door. It was raining and Naylor carried an umbrella. The video makes clear that the marshals reached Naylor near the end of the long sidewalk leading to the street near the courthouse sign. Naylor refused to follow orders to stop. The marshals grabbed him and Naylor began swinging his arms, trying to pull away. Concerned about the renewed resistance and continuing escalation of the confrontation, Guerrero used a single arm take down to force Naylor to the ground. He was then handcuffed (in full view of passing motorists) and taken into custody.

The marshals then secured an arrest warrant from this Court and transported Naylor to the Vigo County Jail. His profane tirade continued en route to jail. The officers subsequently discovered two kitchen knives and a box cutter in the vehicle. Abigail Naylor testified that the knives had been used to eat on prior road trips in the car. She was aware that her father regularly carried a box cutter.

Naylor explained that he felt Gifford had yelled at him. He said his "brain was swirling" after that and "a good day was turning bad." He testified that he felt the officers were aggressive and that he felt Guerrero in particular "wanted to thump me" and "looked fiercely" at him. He

denies swinging his arms or resisting the officers when he exited (again, the surveillance video is inconclusive). He remembers those details remarkably well; the other acts alleged by the other witnesses he remembers less well other than to concede that he "did swear at the marshals."

## Conclusions of Law

1. The Court finds by a preponderance of the evidence that the defendant is guilty of both violations set forth in the Petition on October 31, 2013:

    a. Naylor did not follow the instructions of the probation officer by failing promptly to leave the courthouse when instructed on that date.

    b. Naylor committed the following violations of state law on October 31, 2013:

    1) The Court finds by a preponderance of the evidence that Naylor violated I.C. 35-45-1-3 (disorderly conduct) by recklessly, knowingly or intentionally engaging in tumultuous conduct and making unreasonable noise and continuing to do so after being asked to stop; and

    2) The Court finds by a preponderance of the evidence that Naylor violated I.C. 35-44.1-3-1 (resisting law enforcement) by forcibly resisting a law enforcement officer, i.e., two deputy marshals.[2]

2. The Court finds Naylor did not violate I.C. 35-45-2-1. His loud, vulgar, persistent and aggressive tirade was disorderly, but there is no evidence in the record that supports the articulation of a threat or any evidence that any law enforcement or probation officer was intimidated within the definition of the statute.

---

[2] With respect to this allegation, the Court observes that it credits the testimony of Filson and Guerrero and discredits the testimony of Naylor with regard to the conduct at the end of the sidewalk. The Court also observes this is a narrow call saved by the "preponderance of the evidence" standard; the same result would not occur with a "beyond the reasonable doubt" standard.

3.       The violations noted in the Findings of Fact under Paragraph 1(a) and 1(b) constitute Grade C violations under §7B1.1(b), *United States Sentencing Guidelines* (Chapter 7, Violations of Probation and Supervised Release).

4.       The defendant's criminal history under §7B1.4(a) is Category III.

5.       Based upon these conclusions, the sentencing options for this defendant include a range of imprisonment from five to 11 months based upon these findings and conclusions. *See,* §7B1.4(a).

6.       Based upon these findings and conclusions, the Magistrate Judge recommends that the defendant's supervised release be terminated. The Magistrate Judge further recommends that defendant be sentenced to a six-month term of incarceration.[3]

7.       In reaching these conclusions, the Court has considered the following factors in 18 U.S.C. §3553:

a.       (a)(1) [nature and circumstances of the offense and the history and characteristics of the defendant, here, a history of resistance and misconduct while on pre-trial and supervised release; the disruption in a United States Courthouse in an atmosphere of heightened sensitivity to courthouse security;[4] evidence of utter disrespect for authority founded either in contempt or paranoia, but, in any event, conduct that was contemptible and contrary to the reasonable

---

[3] The Court takes note that the maximum possible penalty for a Class B misdemeanor, i.e., disorderly conduct, is 180 days in jail. As noted elsewhere in this submission, a maximum penalty for that offense is in order when considered along with the defendant's underlying offense and sentence and other factors set forth in this recommendation.

[4] As the Court noted at the conclusion of the hearing, federal courthouses have been under assault in recent years despite precautions take in the aftermath of the terrorist destruction of the Murrah Federal Building in Oklahoma City. Within the last five weeks, a shooting occurred at the federal courthouse in Wheeling, West Virginia. A courtroom security officer was killed at a Las Vegas federal courthouse on January 4, 2010. Escalating violence in and around courthouses, both state and federal, is a major security concern nationally. The federal government incurs great cost to protect the security of all persons conducting business in federal courthouses.

expectations of civil conduct in a public place; the underlying offense of issuing threats through the United States mails];

  b. (a)(2)(B) [affording adequate deterrence to criminal conduct, here, consideration of the relatively modest sentence by the Nebraska court followed by repeated demonstrations that a generous sentence of supervised release was treated with resistance instead of relief and, further, because the Court recommends that any further supervised release be terminated because of the defendant's history of conduct while on supervision, the sole deterrent of criminal conduct for the defendant and others similar situated is to invoke a jail sentence that underscores intolerance for the disruptive conduct, the contempt for lawful behavior, and the totality of both the underlying offense and misconduct while on supervised release];

  c. (a)(2)(C) [not applicable]

  d. (a)(2)(D) [to provide the defendant with a structured environment within which he might get assistance with anger management]

  e. (a)(4) [not applicable]

  f. (a)(5) [not applicable]

  g. (a)(6) [not applicable]

  h. (a)(7) [not applicable]

## **Recommendation**

The undersigned recommends to the Court adoption of these Findings of Fact and Conclusions of Law and the revocation the defendant's supervised release and the imposition of term of incarceration of six months. Supervised release following incarceration is not recommended.

By agreement of the parties, the defendant is ORDERED detained pending the District Court's consideration of this recommendation.

Dated:   11/8/13

Respectfully submitted,

_____
Craig M. McKee
United States Magistrate Judge

**Distribution to:**
James M. Warden, U.S. Attorney's Office
John A. Kesler
Ryan Sharp, U.S. Probation Office
U. S. Marshal's Service